Albert C. Wettengel, Guardian of Annie, Alice and Ida M. Lockhart, minor children, and Robert Lockhart, surviving husband of Maria J. Lockhart, deceased, Appellants, *v.* James T. Gormley, W. L. Mellon Pipe Line, a Corporation, South West Pennsylvania Pipe Lines, a Corporation, and J. M. Guffey, M. Murphy, John C. Fisher, Robert McFarland, William McFarland and Alexander McFarland, trading as the Oakdale Oil Company.

### Anna B. Wettengel *v.* Same, Appellant.

[Marked to be reported.]

*Lease—Oil and gas lease—Devise—Royalties—Will.*

An owner of three contiguous farms executed an oil and gas lease of the three farms as a single body for a fixed term, reserving a royalty and providing that " all conditions between the parties hereto shall extend to their heirs, executors, administrators and assigns." He devised the three farms respectively to his three children. Under this lease a number of wells were sunk upon one of the farms, and no wells were sunk upon the other farms. *Held,* (1) that each child was entitled to receive such shares of the total royalty as his or her share of the land bore to the whole tract covered by the lease, no matter on whose farm the wells were located; (2) that the child upon whose land the wells were sunk was entitled to compensation for the decrease in the rental value of his part, caused by the presence of the wells; (3) that the cost of repairing injuries to the realty caused by the sinking of the wells should be postponed until the termination of the lease made it possible intelligently to consider that subject. Wettengel v. Gormley, 160 Pa. 559, adhered to.

Argued Nov. 9, 1897. Appeals, Nos. 185 and 186, Oct. T., 1897, by plaintiffs, from decree of C. P. No. 2, Allegheny Co., Jan. T., 1895, Nos. 80 and 81, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Decree modified.

Bill in equity for an account.

The facts appear by the opinion of WHITE, J., which was as follows:

The cases were heard on bills, answer and testimony, the same questions, and tried together.

### STATEMENT.

James Gormley, the father of these parties, made a lease, dated July 14, 1888, to J. A. Tomlinson, which, by successive assignments, became vested in the parties who drilled the wells hereinafter mentioned. The lease was for the exclusive right of drilling and operating for oil and gas in a tract of land containing 600 acres, more or less, for fifteen years, a rental of fifty (50) dollars a month, to be paid until a producing well was obtained, then a royalty of the oil, and certain provisions, if gas should be obtained, which are not material in this controversy. The lease contained the usual surface privileges, the right to lay pipes, and right of way for roads, etc. James Gormley died October 1, 1890, leaving a will, dated November 13, 1889, devising the land, which consisted of three distinct farms, to his son, James T., and his daughters, Anna B. and Maria J., one farm to each, particularly described. No wells were drilled, and nothing done under the lease except to pay the monthly rental, during the life of James Gormley. One or two wells were drilled after James Gormley's death, on the farm of Mrs. Wettengel, but no oil or gas obtained. Ten wells were put down afterwards on the farm of James T. Gormley, six of which produced, and still produce, oil in paying quantities; the other four some oil, but not enough to pay for operating them. James received the royalty of oil and sold it. These bills are filed to compel him to account and pay over to the plaintiffs their share of the proceeds, claiming a pro rata share according to the acreage of the three farms. The three farms touched each other, but were distinct and, mainly, wide apart, purchased by James Gormley at different times. In his will they are devised as separate farms, each described by reference to deed of purchase. The will contains no reference to the lease to Tomlinson. The lease is for the right to drill, etc., but gives no immediate possession of any part. The right might never be exercised, and no possession of any part might ever be taken. That was the situation when James Gormley made his will and when he died. The lease is for fifteen years, with no clause for a longer continuance. In that time the oil and gas from one farm may be exhausted and the others not touched, or not sufficiently tested. Seven of the fifteen years have expired. If no oil or gas be obtained from the other farms during the fifteen years,

they are freed from this lease. If oil or gas be obtained from them after that time, James T. Gormley could not claim any share of it, although they may have taken nearly two thirds from what was obtained from his farm. The monthly rental paid before a producing well was obtained was properly divided among the three devisees according to the acreage of their farms, for it was the joint rental of the three farms. When that rental ceased there was no longer a joint interest in the lease. Each devisee, it seems to me, took his or her farm in severalty, subject, however, to the rights of the lessee in the lease, and each could claim the royalty that would be due on the oil exclusively produced from wells on his or her farm. If the lease and possession had been of three farms for agricultural purposes, securing a money rental or a share of the crops, each devisee would have taken his or her farm in severalty, but subject to the lease, and a right to have the rental or produce divided, the same as in the case of a lease covering three separate houses and lots. In that case all the rights would be surface rights, and the lessor would have exclusive possession during the term of the lease. Suppose there was a lease giving the lessee the right to enter upon one or all three of the farms for agricultural purposes, rendering a share of the crops to the lessor, and the tenant enters upon one farm only, would the other devisees be entitled to a share in the proceeds of this farm ? In this case there was no possession given in pursuance of the lease, and in no event would there be an exclusive possession. There might never be any possession at all. There is simply an exclusive right to explore for and obtain oil and gas, which are never found on the surface, but always deep down under the surface. Oil and gas in situ are a part of the realty. The analogies in this case are not to surface rights, but rather to minerals and mineral rights under the surface. The wells on one farm will not exhaust the oil or gas on an adjoining farm, and are not likely to interfere in the least with them. It is well known that one well may be a dry hole, and another only two or three hundred feet distant may be a fine producing well. A well near the line of an adjoining property may drain some of the oil or gas from that property, yet it has been held that the owner of the adjoining property has no right to restrain the operating of the well, nor even to restrain the negligent waste of the gas : Hague v. Wheeler, 157 Pa. 324.

From these considerations, and the significant fact that James Gormley in his will made no reference to the lease to Tomlinson, if it were an open question, I would say that these devisees took an absolute fee simple title to his or her farm, subject only to the inconveniences or burdens incident to the lease. And as these inconveniences and burdens would be mainly, if not exclusively, in reference to wells on each farm, each devisee would have to bear such inconveniences and burdens, and be entitled exclusively to the oil or gas produced on his or her farm. It has been decided, however, by the Supreme Court, in Wettengel v. Gormley, 160 Pa. 559, that the devisees in this case are entitled to a share of the oil or gas—the royalty—in all the wells on any of the farms. That case went up on a case stated. If all the facts had been fully presented and considered, perhaps the decision would have been otherwise. But I consider myself bound by it and must decide the present contention accordingly.

The defendant, James T. Gormley, still denies the right of the plaintiffs to any share in the oil produced on his farm. And he further contends that, if they are entitled to a share, he is entitled to have an abatement or set-off for the damages done to his farm and its depreciated value, in consequence of the injuries incident to the production of the fund which is to be divided. This is the immediate question before us.

The total amount of money received by the defendant from the sale of oil—the royalty—after deducting storage, from the beginning, August 19, 1893, to April 18, 1895, was $15,137.83. By common consent of the devisees, the widow of James Gormley, who refused to take under the will, was entitled to one third of that fund, and the same has been paid to her. That leaves $10,091.89 to be distributed among the devisees. There remains to the credit of James T. Gormley oil unsold as follows: In the Southwestern Pipe lines, 200 barrels, and in the Mellon Pipe Lines, 92 $\frac{23}{100}$ barrels. As this oil is unsold, it is not to be counted in this distribution. When sold, the proceeds must be accounted for. The lease referred to the tract of land as containing 600 acres, "more or less." The will of James Gormley referred to the farm of James T. Gormley as containing "about" 202 acres; that to Mrs. Lockhart, as "about" 200 acres; and that to Mrs. Wettengel, as "about" 164 acres.

It is agreed by the parties that the farm of James T. Gormley contains 204 acres, that of Mrs. Lockhart 202 acres, and that of Mrs. Wettengel 164 acres, making in all 570 acres. After the decision of the Supreme Court in the former case, James T. Gormley paid to his two sisters the sum of $443.40, which, in proportion to the acreage, would be to Mrs. Lockhart $243.62½, and to Mrs. Wettengel $199.77½. These amounts must be deducted from their respective shares of the total receipts. In consequence of the debris, the oil and salt water from the wells, the exclusive occupancy of the grounds immediately around the wells, the injury to the tenancy for agricultural purposes by pipes, hauling, etc., the rental has been reduced $200 annually for three years. Ten wells have been drilled on James T. Gormley's farm. Four of them produced so little oil they have not been utilized; the other six are still producing wells. Many other wells may yet be drilled before the lease expires—July 14, 1903. At the expiration of the lease the farm may be left in a very bad condition. The debris from the wells, from the removal of derricks, structures, pipes, etc., and the effects from oil, salt water, gutters, roads, etc., will remain for years. There is no covenant in the lease that the lessees shall repair these injuries. In the course of years, by labor, expense, and proper cultivation, they may be repaired. It will require time and expense, depending largely upon the number of wells that may have been drilled. These injuries to the surface, and the fact that oil and gas have been exhausted, will greatly depreciate the marketable value of the farm. The evidence is that it is depreciated one fourth. But the depreciation from the exhaustion of oil and gas is not an element of damages that can be considered now. The injuries resulting directly from the production of the oil in which the plaintiffs claim an interest, which will require expense and entail loss after the expiration of the lease, are proper elements to be considered in addition to the loss of annual rental. It is very difficult to make an estimate of these damages. The loss of rent will compensate for the damages done during the life of the lease. The condition of the farm and the expense required at the termination of the lease, will depend greatly upon the number of wells. A fair and reasonable rule would be to estimate the expense, at the termination of the lease, of restoring the farm from the effects

of the ten wells now drilled, and if wells be drilled in the future, make the estimate for them to be deducted from future dividends. Adopting this rule and estimating the damages from the testimony at the trial, a fair and reasonable allowance for each well would be $200 ; for the ten wells $2,000.

On the principles indicated, the following calculation shows how the fund should be distributed:

| | |
|---|---:|
| Total proceeds of sale . . . . | $15,137 83 |
| Deduct the widow's third . . . . | 5,045 94 |
| For distribution among devisees . . | $10,091 89 |

Dividing this sum according to acreage:

| | |
|---|---:|
| James T. Gormley, 204 acres . . . | $ 3,611 84 |
| Mrs. Lockhart, 202 acres . . . . | 3,576 42 |
| Mrs. Wettengel, 164 acres . . . | 2,903 63 |
| | $10,091 89 |

| | | |
|---|---:|---:|
| Mrs. Lockhart's share as above . . . | | $ 3,576 42 |
| Deduct paid formerly . . . $ 243 62 | | |
| Her share of the rental . $ 600 | | |
| Her share of the . . . 2,000 | | |
| $ 2,600 | | |
| According to acreage . . . $1,434 94 | | |
| | | $ 1,678 56 |
| Balance due Lockhart's heirs . . . | | $ 1,897 86 |

| | | |
|---|---:|---:|
| Mrs. Wettengel's share as above . . . | | $ 2,903 63 |
| Deduct paid her formerly . $ 199 77 | | |
| Deduct her share of the rental loss and her share of damages of $2,600 as above . . 1165 06— | | $ 1,364 83 |
| Balance due Mrs. Wettengel . . . | | $ 1,538 80 |

Under the decision of the Supreme Court in the case above referred to, James T. Gormley is liable to account to the plaintiffs for the proceeds of the oil he sold from the royalty on his farm, but he is entitled to an abatement, or set-off, for the loss of the rental on his farm, and for damages at the expiration of the lease, in the way of restoring the farm from the effects of

the ten wells, as stated in the foregoing. The balance due the plaintiffs is as above stated.

*J. S. Ferguson*, with him *E. G. Ferguson*, for appellants.— The decree affirmed by the Supreme Court of Pennsylvania, as found in the case of Wettengel v. Gormley, 160 Pa. 559, is res adjudicata. The effect of that decree was to adjudge that these appellants were entitled to participate in the oil production in the proportion which their respective acreage bear to the total acreage which was included in the lease made by James Gormley to Tomlinson, and that it no longer remained open for the appellee to allege in opposition to that decree that he had sustained damages which he ought to be allowed to set off by way of abatement, or in any way, against the amount which his sisters were entitled to receive. The logical result of the decision referred to is that, if, hereafter, wells should be sunk on Mrs. Wettengel's portion, or on the portion of the heirs of Mrs. Lockhart, James T. Gormley would participate in like manner in the product of those wells. No man can tell whether or not such wells will be drilled. There is no reasonable certainty that the farms of Mrs. Wettengel and Mrs. Lockhart will not be damaged in like manner as the appellee now alleges his farm to have been damaged.

*J. McF. Carpenter*, for appellees.—It is clear beyond peradventure that the title to the oil under the farm devised to James T. Gormley was in James Gormley at the time of his death, and therefore passed to his son as part of the farm. To hold otherwise is to set at naught principles of law that have never been questioned. How can the court say that the license to search passed nothing but a right, and yet hold that it converted the substance from realty to personalty. If it had the latter effect, then the executor should collect the profits derived from the wells. Of this there can be no doubt. The conclusion is irresistible, however much it may be at variance with absolutely certain legal principles. The lease passed title to the oil in place or it did not. If title passed, then the profits accruing under the lease belong to the estate of decedent, and are distributable by the orphans' court; if it did not, then the devise to each of the heirs passed the land and all it contained to each

in severalty: Funk v. Haldeman, 53 Pa. 229; Chamberlain v. Dow, 16 W. N. C. 532; Stoughton's App., 88 Pa. 198; Duffield v. Hue, 129 Pa. 94; Duffield v. Rosenzweig, 144 Pa. 520; Barnhart v. Lockwood, 152 Pa. 82; Silsby v. Trotter, 29 N. J. Eq. 228; Shepherd v. McCalmont Oil Co., 38 Hun, 37.

OPINION BY Mr. JUSTICE WILLIAMS, January 3, 1898:

These cases depend upon the same question. The parties were before us on that question in 1893, and the case is reported in 160 Pa. 559. It is frankly conceded by counsel for defendants that if the rule laid down in that case is to be adhered to it rules these. In deference to the decided views of the learned judge of the court below, and the earnest request of counsel, we have listened to what is substantially a reargument of Wettengel v. Gormley, 160 Pa. 559, and have undertaken to re-examine the reasons on which our decision in that case rests. The facts upon which the controversy arises are in no doubt, but need to be stated in order that the precise point in question may be seen. In July, 1888, James Gormley was the owner of three contiguous farms, containing together nearly six hundred acres of land. He made an oil and gas lease of the six hundred acres as a single body to Tomlinson, for the term of fifteen years, reserving a royalty of one eighth part of the oil produced. This lease gave Tomlinson the exclusive right to bore and operate for oil upon the entire six hundred acres during the term of fifteen years, and bound him to conduct operations under the lease in such manner as to interfere as little as possible with operations by the lessor and his tenants in the cultivation of the surface. It closed with a stipulation providing that "all conditions between the parties hereto shall extend to their heirs, executors or assigns." The legal operation of this lease, as between the lessor and the lessee, "their heirs, executors or assigns," was to sever the leasehold from the freehold estate. Thereafter the exclusive right of access to the oil bearing stratum was in the lessee, whose duty it was to develop and operate the leasehold estate for oil and gas. The exclusive right to cultivate the surface, subject to the easement created upon and over it in aid of the operations of the lessee, was in the lessor and his tenants. A sale of the freehold to any person having notice, actual or constructive, of the lease would have been subject to its provisions, and would in

no way have impaired the rights or interest of the lessee. The purchaser would have taken just the estate his vendor was competent to convey, and he would have held it subject to the terms of the lease in every particular. The estates were separate, independent, and in independent hands. The one was personal, an estate for years. The other was real, a fee simple. The right to receive or demand the rent was a chose in action that would fall, under our intestate laws, to the personal representative of a decedent. The heir could not disturb or interfere in any manner with the production of oil or gas pending the settlement of the estate of the testator, or with the collection of the royalties. But Gormley made a will, by the terms of which he severed the six hundred acres into three tracts or farms, and devised one of these to each of his three children. They took the title precisely as the testator held it, subject to all the provisions of the lease. As between themselves, the division of the surface was absolute; but as to the holder of the leasehold, each took the part devised to him, subject to the common burden which had been put upon the entire body of the land as a single undivided tract containing six hundred acres, more or less. As the lease covered all the land, so the rent may be said to issue from each and every part of it. The royalties belonged to the owners of the six hundred acres, and not to the owner of any subdivision of it. But as we have seen the royalties were personal. They were not disposed of by Gormley's will. They were not even referred to in it. The intestate laws must in such case be looked to for the disposition of this very considerable part of his estate. The children hold together all the acreage that is covered by the lease, and each should receive such share of the royalty as his or her share of the land bears to the whole tract covered by the lease. It does not matter in what acre or hundred acres the wells may be situated. The royalties are not payable by the acre, nor by the farm into which the surface may be divided, but upon the total production, wherever within the six hundred acres the production may take place.

There is no escape from this proposition. The cleaver of the testator applied by the terms of his will for the division of the lands between his children made a clean cut separation of the shares of each down till the leasehold was encountered. There its descent was arrested until the term created by the lease

expires. When that occurs, its downward course will be instantly resumed, and the severance of the freehold and its minerals will be complete. The further reflection bestowed upon this question has in no sense shaken our confidence in Wettengel v. Gormley, 160 Pa. 559. We adhere to it.

There is however one new question raised in these cases. It is whether the injury done to any one of these devisees upon whose surface the wells may happen to be should not be borne as the benefit is shared, in equal proportions by the three devisees of James Gormley. The learned judge of the court below so held. He found as a fact that the injury done the defendant in the reduction of the rental value of his part of the six hundred acres was $200 per annum, and had been for three years prior to his decree ; and he found as a conclusion of law that this sum of $600 for three years' loss upon rentals should be deducted from the royalties before division. This conclusion we are not disposed to disturb. It is equitable in its operation. But the defendant has his share of the benefit arising from the production of the oil, and should bear his share of the loss of rental resulting from its production. As to the finding that " It will require time and expense depending largely upon the number of wells that may have been drilled " to restore the surface to a proper condition after the lease has ended, we see no reason to doubt that the learned judge is correct; and it may be that the sum he fixes upon, viz : $200 per well will be required for this purpose, but it is certainly not demandable now. The lease has some years to run. Meantime the defendant will be fully reimbursed for any loss he sustains because of the operations under it by the allowance for loss of rental resulting from such operations. The cost of repairing injuries to the realty can be considered when the time for entering on such repairs approaches.

The decree requiring an account for royalties is affirmed. The calculation should be modified to meet the requirements of this opinion. The $600 loss of rental should be deducted from the three devisees in proportion to their ownership of the surface, and the cost of repairs omitted from the calculation until such time as the approaching termination of the lease makes it possible, intelligently, to consider the subject.