# CHARLESTON.

RYMER v. SOUTH PENN OIL CO.

Submitted January 15, 1904—Decided February 2, 1904.

1. OIL LEASE—*Payment of Royalty—Parol Evidence.*

Where several owners in fee of contiguous tracts of land lease the whole as one tract for oil and gas purposes, and the one-eighth royalty oil is to be paid by the lessee in the usual way by running the same into the pipe lines to the credit of "the parties of the first part" (the lessors) and the lease is silent as to the division of the royalty between the lessors, and where the development is all on one tract owned in severalty by one of the lessors, who claims to be entitled to all the royalty, upon interpleader of the lessee for determination as to whom to pay the royalty as between the lessors, parol evidence is admissible to prove a contemporaneous agreement between the lessors that the royalty should be paid and delivered to the owner of the particular tract from which the oil is produced. (p. 538).

Appeal from Circuit Court, Tyler County.

Bill by Frank L. Rymer against the South Penn Oil Company and others. Decree for plaintiff, and certain defendants appeal.

*Affirmed.*

R. F. FLEMING, T. N. PARKS, D. F. PUGH, and O. W. O. HARDMAN, for appellants.

J. H. STRICKLING and T. S. ENGLE, for appellees.

McWHORTER, JUDGE:

Henry A. Rymer and Frank L. Rymer and Edith, his wife, executed to the South Penn Oil Company, the following lease; "Agreement, made and entered into the 24th day of August A. D. 1897, by and between H. A. Rymer, Frank L. Rymer and Edith Rymer his wife of Middlebourne, County of Tyler and State of West Virginia parties of the first part and the South Penn Oil Company, a Pennsylvania Corporation, party of the second part. Witnesseth:—That the said parties of the first part for and in consideration of the sum of one dollar to them

in hand well and truly paid by the said party of the second part, the receipt of which is hereby acknowledged and of the covenants and agreements hereinafter contained on the part of the said party of the second part to be paid, kept and performed, have granted, demised, leased and let by these presents do grant, demise, lease and let unto the said party of the second part, its successors or assigns for the sole and only purpose for mining and operating for oil and gas, and of laying pipe-lines and of building tanks, stations and structures thereon to take care of the said products, all that certain tract of land situate in Ellsworth District, Tyler County and State of West Virginia on waters of Middle Island, bounded substantially as follows: On the North by the lands of J. I. Gregg and J. W. Crumrine. On the East by the lands of J. W. Crumrine, H. A. Rymer and F. L. Rymer. On the South by lands of E. J. Baker and S. Addlesberger. On the West Geo. Mason heirs. Containing three hundred and sixty (360) acres, more or less, reserving however, therefrom ten (10) acres around the buildings on which no wells shall be drilled by either party except by mutual consent. It is agreed that this lease shall remain in force for the term of five years from this date, and as long after the commencement of operations as said premises are operated for the production of oil or gas. In consideration of the premises, the said party of the second part covenants and agrees; 1st to deliver to the credit of the parties, their heirs or assigns free of cost in the pipe line to which it may connect its wells the equal one-eighth of all oil produced and saved from the leased premises; and 2nd to pay three hundred dollars per year for the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said payment to be made on each well within thirty days after commencing to use the gas therefrom, and to be paid yearly thereafter while the gas from said well is so used. Second party covenants and agrees to locate all wells so as to interfere as little as possible with the cultivated portions of the farm. Provided, however, that this lease shall become null and void, and all rights hereunder shall cease and determine unless a well shall be completed on the said premises within three months from the date hereof, or unless the lessee shall pay at the rate of one hundred and twenty-five (125) dollars,

quarterly, in advance for each additional three months, such completion is delayed from the time above mentioned for the completion of such well until a well is completed. Such payment may be made direct to the lessors or deposited to their credit in the Post Office at Middlebourne, W. Va. First parties are to have gas for domestic purposes free of cost by making their own connections.

It is agreed, That the second party is to have the privilege of using sufficient water from the premises to run all necessary machinery, and at any time to remove all machinery and fixtures placed on said premises, and, further shall have the right at any time to surrender this lease to the first part, for cancellation, after which all payments and liabilities to accrue under and by virtue of its terms shall cease and determine, and this lease become absolutely null and void. Witness the following signatures and seals: Henry A. Rymer, (seal) ; Frank L. Rymer, (seal) ; Edith C. Rymer, (seal) ; South Penn Oil Company, (seal). By N. F. Clark, First Vice-President. Witness: C. Y. Benedum." Which is duly acknowledged by the lessors and recorded. The South Penn Oil Company subleased a part of the land so leased to it, to Treat and Crawford who took possession under their sub-lease and drilled two wells which produced oil in paying quantities. The South Penn Company afterwards took possession of the residue and bored seven wells near to those bored by Treat and Crawford producing large quantities of oil. The tract of three hundred and sixty acres so first leased was composed of a tract of ninety acres, another of twenty-five acres both of which are vested in fee at the time of making the lease in Frank L. Rymer, the residue of two hundred and forty-five acres was owned in fee by Henry A. Rymer. The two wells bored by Treat and Crawford, as well as those bored by the South Penn Company were all on the ninety acre tract which was the property of Frank L. Rymer. Treat and Crawford delivered to Frank the one-eighth of the oil produced from the two wells, who also demanded from the South Penn Oil Company an accounting and delivery to him of the full one-eighth royalty from the wells bored by it, which it refused to do, claiming that the lease of the three hundred and sixty acres was a joint lease and that the royalties were payable to the lessors the said Frank L. Rymer and the heirs at law of Henry A. Rymer, who had

deceased early in the year 1898, soon after the making of the lease. The said Henry A. Rymer executed his will whereby he devised to his daughter, Susan Smith during her life, remainder to her children in fee, one hundred acres of the said leased premises, and to the plaintiff, Frank L. Raymer one hundred acres and the residue of said leased premises to his daughter Lizzie Boyers, wife of Dr. F. C. Boyers.

Frank L. Rymer filed his bill in the circuit court of Tyler county against the South Penn Oil Company and the Eureka Pipe Line Company alleging that all of the wells bored by the said South Penn Oil Company were located on his tract of ninety acres of land which being vested in him in fee simple entitled him to the whole of the one-eighth royalty oil therefrom, and the gas rentals, and praying that the defendant companies be made parties to the bill and be required to answer the same and make a full account and discovery of dates that any oil had been run into the pipe lines from the said wells so drilled by the South Penn Oil Company upon the the said ninety acre tract of land and amount of oil so run into the lines of the Eureka Pipe Line Company each time and the total amount of oil so run into the lines from said wells, and that the said companies be ordered to pay over to plaintiff any oils or money found due on such accounting and for general relief.

The defendant, South Penn Oil Company filed its demurrer to plaintiff's bill for non-joinder of parties claiming that the heirs and devisees of Henry A. Rymer were necessary parties, the lease being a joint lease and the royalties and rentals payable to the lessors jointly. The demurrer was overruled by the court. South Penn Oil Company then filed its answer in the nature of an interpleader and cross bill praying that plaintiff be required by amended bill or orthewise to make the heirs and devisees of Henry A. Rymer parties defendants in the suit that respondent might be fully protected in the payment of royalties under the said lease as well as to protect and preserve the rights of Treat and Crawford in carrying out the provisions of their lease in the delivery of royalty oil thereunder. By the cross bill of the South Penn Oil Company, all heirs at law of Henry A. Rymer, the defendant Eureka Pipe Line Company, and Treat and Crawford were made parties defendants thereto. The defendants Susan Smith, David M. Smith, her husband, Elizabeth

Boyers and C. F. Boyers, her husband, filed their answers deny-
ing the right of plaintiff F. L. Rymer to recover and receive
all the royalty oil produced from the 90 acre tract of land or
any other particular part of the tract of 360 acres leased jointly
by the said Frank L. Rymer and Henry A. Rymer, to the South
Penn Oil Company. Depositions were taken and filed in the
cause by the plaintiff F. L. Rymer for the purpose of proving
an oral contract between the lessors, Frank L. Rymer and Henry
A. Rymer, contemporaneous with the lease of August 24, 1897,
whereby it was understood and agreed that the several lessors
should receive the royalty oil produced from their respective
tracts of land owned by them in severalty and comprising the
360 acre tract so leased, and to show how rentals paid before
the completion of a well had been distributed under the lease.
Other depostions were also filed by the plaintiff and by the de-
fendants Susan Smith and Elizabeth Boyers, objections and
exceptions by the said defendants were made to the depositions
of plaintiff taken and filed for the purpose of establishing such
oral agreement because incompetent, being contradictory of the
language and provisions of said lease.

The cause was heard on the 9th day of December, 1902, when
the court overruled said objections and exceptions to the deposi-
tions as to their competency to prove such parol agreement and
decreed all the royalty oil, and the consideration for gas that
may be produced from the ninety acres and the twenty-five acres
of land under the said lease to the plaintiff Frank L. Rymer,
and that defendants, Susan Smith and Elizabeth Boyers take
nothing by their answers and cross bills, and directing the South
Penn Oil Company to run said royalty oil produced and saved
from said two tracts to the credit of Frank L. Rymer, into
the pipe lines of the Eureka Pipe Line Company, which was di-
rected to credit same to said Frank L. Rymer.

The errors complained of by the appellants, Elizabeth Boyers
and Susan Smith are, first, the overruling of the demurrer of
the South Penn Oil Company, and, second, overruling their
objections and exceptions to the depositions and testimony of
witnesses C. Y. Benedum, J Traugh and T. H. Harter, so far
as the same tend to set up a new agreement between H. A.
Rymer in his lifetime and the plaintiff touching the lease of the
lands in controversy, and in so far as the same relate to state-

ments and conversations between H. A. Rymer, since deceased, and Frank L. Rymer and between either of said witnesses and H. A. Rymer and Frank L. Rymer, in so far as the same tend to. prove declarations and statements made by H. A. Rymer in his lifetime at the time of executing the lease in question or subsequent to the making and delivering of said lease, and that the court erred in decreeing that the appellants, Elizabeth Boyers and Susan Smith were not entitled to any of the royalty which came from the ninety acres and that Frank was entitled to all the royalty and the consideration for the gas produced from the ninety acres and the tract of twenty-five acres. It is claimed in the brief of the appellee that the defendants, Susan Smith and Elizabeth Boyers not being parties at the time of the overruling of the demurrer of the South Pen Oil Company by the court were not affected by the ruling of the court and the South Penn Company not being an appellant said Smith and Boyers could not be injured by it and have no right to appeal from the decision; citing *Beard* v. *Arbuckle,* 19 W. Va. 135; *Long* v. *Perine,* 44 W. Va. 243, and other authorities; that if the court erred in overruling the demurrer the South Penn Company was the only party that could complain and it makes no complaint and does not join in the appeal. Susan Smith and her husband, David M. Smith, and Elizabeth Boyers and F. C. Boyers were made parties by the interpleader and cross bill of the South Penn Oil Company and by their own answers, and cross bills, thus bring before the court the questions involved between the parties and which the South Penn Oil Company had a right to have adjudicated upon a bill of interpleader in a court of equity. *Petroleum Co.* v. *Gale,* 6 W. Va. 525. As to the alleged error of the court in overruling the objection of defendants Smith and Boyers to the oral testimony of C. Y. Benedum the agent of the lessee South Penn Oil Company, who prepared and took the lease, and also the testimony of J. Taugh and T. K. Harter in construing the lease. It is claimed by appellants that the court could look only to the language of the lease itself, for its construction, the same being· unequivocal, clear and unambiguous. As between the lessors upon the one side and the lessee upon the other side this clearly appears to be true, there is no ambiguity, but is there any contract anywhere in the lease as between the individual lessors? Not a

word to show the relation between them, they have individual rights as between themselves. The lease shows that the royalties and the consideration for the gas which might be sold from the premises was to be paid and delivered to "the parties of the first part," but it is not provided as to how it shall be divided between them when received. The case of *Harness v. Eastern Oil Company*, 49 W. Va. 232, is relied on by appellants as being a case in point. In that case the lease was very similar to that in question here, but the lease showed on its face that the land leased was in two separate tracts, one hundred and fifty-two acres owned by Thomas B. Harness and thirty-five and one-half acres owned by his wife, Anna K. Harness, but leased as one tract of one hundred and eighty-seven and one-half acres. It was held "as between the lessors and lessee to be a joint lease of one tract of one hundred and eighty-seven and one-half acres," being so treated by both the lessor and lessee from the time of its execution and until long after developments were made upon the 152 acres, the lessors having jointly received and receipted for the royalty and the consideration for the gas from the one hundred and fifty-two acre tract. No question was raised as to the distribution of the royalty and gas consideration as between the lessors. It is a conceded fact that the only production of oil or gas upon the leased premises is produced from the 90 acre tract which is held in fee and in severalty by the plaintiff, Frank L. Rymer, and it is well settled in this State that oil in place is as much a part of the realty as timber, coal, iron ore, or salt water. *Williamson* v. *Jones,* 39 W. Va. 231 *Wilson* v. *Youst,* 43 W. Va. 826; *Lawson* v. *Kirchner,* 50 W. Va. 344; *Ammons* v. *Ammons, Id.* 390. See also, Gould on Waters, sec. 291; *Staughton's Appeal,* 88 Pa. St. 198; *Funk* v. *Haldaman,* 53 Pa. St. 229. And this ruling applies with equal force and for the same reason, to gas as well as to oil. It is further said in the *Wilson Youst Case,* p. 834, quoting Gould on Waters, "A lease of land, for the purpose of mining oil, coal, rock, or carbon oil, passes a corporeal interest which is the proper subject of an action of ejectment; and a proportionate share of the oil to be produced by an oil well is an interest in land, a parol sale of which is void under the Statute of Frauds." The oil to be paid as royalty is the consideration paid for the oil sold and taken from the premises. Where it is not provided

how the consideration is to be applied, or how it shall be divided
between or among those entitled to receive it, parol evidence
is admissible to explain that which is not expressed.   Brown on
Parol. Ev. sec. 50, says: "Where the instrument does not express
the entire agreement, and does not appear to express the entire
agreement, or there is a collateral agreement not embraced
therein, parol evidence is competent to show the omitted part,
whether contemporaneous or antecedent, if it does not ·conflict
with the instrument;" and cases there cited: *Johnson* v. *Burns,*
39 W. Va. 628 (syl. pt. 1).   Again at section 92 "Parol evidence
is competent to contradict the recital of receipt of the con-
sideration, or to show an additional or different consideration,
but not to contradict the deed as to price or quality," citing
*O'Neal* v. *Lodge,* 3 Harris and McHenry, 433 (S. C) ; 1 Am.
Dec. 377, and many other cases.   In *Hall* v. *Solomon,* 61 Conn.
476, (23 Atl. Rep. 876), the court says: "It will be remem-
bered that it is not the office of a deed to express the terms of the
contract of sale, but to pass the title pursuant to the con-
tract.   Therefore a parol agreement, being a part of the con-
sideration for the sale, restricting the use of the premises in
one particular for a limited period is not merged in the deed,
and does not qualify or in any way affect the title to the land;
and the admission of parol evidence to prove such an agreement
is no infringement of the rule that parol evidence is not ad-
missible to contradict, vary, or explain a ·written instru-
ment;" citing *Collins* v. *Tillou,* 26 Conn. 368; *Price* v.
*Woodward,* 6 Pick. 206; *Willis* v. *Hulbert,* 117 Mass. 151;
*Tallmadge* v. *Bank,* 26 N. Y. 105.   And in section 92,
Brown on Parol Evidence:   "It is well settled that the
consideration clause is open for explanation for any pur-
pose except to defeat the conveyance," citing *Murdock* v.
*Gilchrist,* 52 N. Y. 247.   And quoting from *Goodspleed* v.
*Fuller.* 46 Me. 141, he says:   "The entire weight of authority
tends to show that the acknowledgment of payment in a deed is
open to unlimited explanation in any direction."   Appellants
rely upon the case of *Heatherly* v. *Bank,* 31 W. Va. 70, (syl.
pt. 1), where it is held, that:   "If the language of a written
agreement is on its face ambiguous, the court will look at the
surrounding circumstances, at the situation of the parties and
the subject matter of the contract, and at the acts done by the

parties under it, for aid in giving a construction of its lan-
guage, but not to the verbal declaration of the parties." In that
case the issue was betweeen the principal parties to the contract
and not between the individuals constituting one of the parties
to the contract, as in case at bar, where there is no contract or
semblance of a contract contained in the lease as between them-
selves; but they bear certain relations to the contract and to
each other which it is incumbent upon the court to ascertain
and settle and for that purpose "the court will look at the sur-
rounding circumstances, at the situation of the parties and
the subject matter of controversy."

H. A. Rymer, and Frank L. Rymer were the owners in, sever-
alty of contiguous tracts of land, the former two hundred and
forty-five acres, the latter one hundred and fifteen acres, mak-
ing together three hundred and sixty acres. They executed to-
gether a lease of the whole three hundred and sixty acres where-
by they sold seven-eights of the oil underlying said land to the
lessee in consideration of one-eighth of all the oil to be produced
therefrom to be delivered as produced, but their contract of
lease or sale is entirely silent as to the division between them of
the consideration so to be paid in oil. It is not disputed that
the oil underlying the several tracts is the property of the re-
spective owners of said tracts, a part of the realty itself, and
when they receive, each that which is produced from his own
land he is but receiving his own, the subject matter of the con-
tract between the lessors and lessee, now in controversy between
the plaintiff Frank L. Rymer and the heirs of H. A. Rymer,
is the sole property of Frank L. Rymer. The contract of lease
of August 24, 1897, having no provision as to the distribution
of the royalty oil between the parties of the first part parol
testimony tending to show the intention of the lessors as to such
distribution, as evidenced by the declaration of the parties at the
time of executing the lease, as well as the subsequent declara-
tions of H. A. Rymer are competent evidence to aid in arriving
at a proper conclusion as to such distribution. It is shown by
the testimony of C. S. Stealey that the rental of $125 per quar-
ter paid prior to the completion of the first well was placed in
his hands for distribution, and when asked who placed the ren-
tal in his hands, answered: "Well, I think Mr. Frank L.
Rymer did part of the time and I know Frank Hix did once"—

stating that Frank Hix was then working for South Penn Oil Company. "Frank Hix left money once, and Mr. Rymer the balance of the time." Mr. Hix left $125.00 and witness said: "I apportioned it among the three parties, Mrs. Smith—I am not sure whether I handed it to Mrs. Smith or not, but she got it all right—Mrs. Boyers and Frank L. Rymer. Q. You may state what sum was paid to each out of the $125.00? A. Frank L. Rymer $74.65; Mrs. Smith $34.73 and Mrs. Boyers $15.62, less the fee of the money order and postage, which would amount to twelve cents for the money order, and stamped envelope three cents." This was a proper distribution of the rentals accruing while cash rental was payable prior to the completion of the first well, when the cash rental ceased, and tended to show how the parties understood the lease.

It is insisted by appellants that "the weakest of all human testimony is that of witnesses who testify to the declarations of the dead" and cite "Justice Manning in Succession of Piffet, 37 La. Ann. 873," and also cite 1 Greenlief on Evidence, section 200, which treats of the uncertainty of such evidence, and says: "It frequently happens, also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement, completely at varience with what the party actually did say;" and adds, "But where the admission is deliberately made and precisely identified, the evidence it affords is often of the most satisfactory nature." The evidence in this case is of such a character that these uncertainties are not likely to exist and it depends more upon the credibility of the witnesses than of their recollection, as to certain and definite statements made by the parties, and no effort was made to impeach the witnesses, or otherwise discredit them, further than the criticism of their testimony by counsel in their briefs. When the contract of lease was drawn, according to the evidence of Benedum, he suggested that they make the lease in one; when he says that they explained to him, as best they could, that each of them owned in fee land in the Jug; that these lands were adjacent to each other, and that they would lease them in a joint lease, providing that each party should secure his own royalty. The witness, J. Traugh, states that he and H. A. Rymer, in 1897, both lived in the town of Middlebourne; that he had a conversation with H. A. Rymer in front of the latter's house.

"He met me right there and stopped me, and we were talking, and he said, 'I have just got a rental from my land at the Jug.' He said, 'I get $125 quarterly.' When he told me he leased his land, I knew Frank Rymer had land in there, and I asked him what he did with that, and he said, 'We both leased together.' He said, 'Each one of us draws our own rental from the land, and also the oil.' He states that this was in 1897, a short time before he died. T. K. Harter, a nephew, by marriage, of H. A. Rymer, says he had a conversation with Rymer in 1897, perhaps in November or December, sitting in Rymer's room, when he told witness that "he and Frank had leased their land to the South Penn Oil Cimpany for $360, I believe, and $125 quarterly rental." And in answer to the question, what else he said: "I asked him if he thought it was well to lease jointly, and he said that he thought it was all right; that Benedum had proposed it; that each one would get their own share of the rental, and if there was any oil, his oil produced from his own land—that is the royalty oil produced from their own land."

Appellants claim that their proposition is fully sustained by the decision in *Higgins* v. *Patroleum-Asphalt Company*, 109 Cal., 304; 41 Pac. Rep. 1087. In that case Higgins and one Mary A. Ashley owning contiguous tracts of land underlaid with a deposit of bituminous rock and also deposit of liquid asphaltum, executed a lease to Joseph Sheerer for the term of twenty years, in consideration of the lease, among other things, the lessee promised to pay "to the parties of the first part," lessors, on the first day of each and every month thereafter during said term, "the sum of fifty cents per ton for each ton of bituminous rock and liquid asphalt which he may have mined, taken or removed from said premises during the calendar month then next preceding, and at the same time and place of such payment to deliver to the said parties of the first part, a full and true statement in writing of the number of gross tons of bitumuous rock and liquid asphalt mined, taken or removed from said premises during the calendar month for which such payment is then made," with right of ingress and egress to and from said deposits over the lands owned by the said lessors as might be agreed upon between the parties to the lease, with privilege to the lessee of erecting such building upon the land adjacent to such deposit as might be necessary for the accommodation of his workmen

and the prossecution of his work. In December, 1891, the defendant company became the sole owner of the lease by assignment. The court said, at page 306: "It appears, and is undisputed, that at the date of the lease (June 4, 1887) the lessors were not tenants in common of any part of the land described in the lease nor of any part of the deposit of bituminous rock, leased; but that each severally owned a definite part of both adjoining each other and the deposit leased extended horizontally through the contiguous lands of both lessors, as described in the lease." In June, 1892, Ashley conveyed all her part of the land described in the lease, which she severally owned, to the defendant, by a definite description, after which conveyance the tract had been known as the "Ashley tract", and the remainder of the land described in the lease as the "Higgins tract;" that during the first seven or eight months immediately after the conveyance of the Ashley tract to the defendant, Higgins claimed, and was paid by the defendant one-half the stipulated rent or royalty, twenty-five cents per ton on statements regularly made by the defendant to plaintiff, as per lease, and during the same period and ever after Ashly treated the lease so far as she was interested, as extinct, or merged in her deed of her land, and no rent had ever been demanded by, or paid to her. Defendant continued to pay royalty on rock mined estimated at two thousand pounds for a ton until April, 1893; after which it refused to make further payment on rock not shipped from the mine or per ton of less than twenty-two hundred and forty pounds. Suit was brought by Higgins to recover twenty-five cents per ton for one thousand tons mined from the deposit, whether reduced to asphalt or shipped from the mine or not, during the months of April, May, June and July, 1893. Higgins recovered one-half the royalty notwithstanding the lessee had elected to mine only on that part of the deposit lying within the Ashley tract, and the court says: "Had they beeen tenants in common, Higgins would still be entitled to a part of the rent proportionate to his undivided portion of the demised premises, but as they are not tenants in common he is entitled, in the absence of an express or presumed agreement to the contrary, to a portion of the royalty proportionate to the comparative value of his distinct part of the demised premises; and in this case the terms of the lease warrant the presumption that each lessor was

to receive one-half of the royalty; and such presumption is in perfect accord with the practical construction of the lease by the parties thereto, up to April, 1893." There being nothing in the lease to indicate that other than an equal division was to be made of the royalty between the lessors, of course the presumption would be that they received the royalty jointly and in equal shares, and the lessors themselves having so construed the lease, and so received and divided the royalty, the court could give it no other construction. So in the case of *Harness* v. *Eastern Oil Company*, cited, the lessor had always so construed it and so acted upon it as between themselves, the court saw no reason for construing it otherwise; indeed there was no contention in that case as between the lessors themselves. In case at bar lessee had full notice at the time of the execution of the lease that the lessors were to receive each the royalty oil produced from his tract; that the lease was so drawn and executed at the suggestion of C. Y. Benedum, agent of the lessee, and the lessors both said they would place the lands in a joint lease "providing that each party should receive his own royalty."

The appellants claim that the case of *Wettengel* v. *Gormley*, 160 Pa. St. 559, 28 Atl. Rep. 934, settles the principles involved in this case in favor of the appellants. James Gormley owned three contiguous farms containing together about six hundred acres. In July, 1888, he made an oil lease on the whole of the six hundred acres as one tract, to run fifteen years, and reserved the usual royalty of one-eighth of all the oil produced under the lease. The lease gave the lessee the usual privilege upon the land among which was the right to take water from any part of it and for any extent needed, a right-of-way into and over the land; a right to lay pipe lines etc. The lease concluded with the following stipulation: "It is understood between the parties to this agreement that all conditions between the parties hereto shall extend to their heirs, executors and assigns." The lessor died in 1890. By his will he gave one of the farms to each of his three children in fee, making no mention of the lease, which included them all. The devisees entered into possession of their respective farms as held in severalty. "The holder of the oil lease has, in the meantime, put down several oil wells, and is producing oil therefrom." It does not appear from the opinion clearly

whether the wells were drilled before or after the devisees took possession of their respective farms under the will. The wells drilled happened to be all on the farm devised to James T. Gormley, the defendant, and he claimed the entire royalty. The court held, that, "Where during the term of an oil lease of three contiguous farms embracing six hundred acres, the lessor dies and devises the farms to different persons, the devisees are entitled to share alike in the royalty reserved, though the wells are all on one farm, as through such wells the oil may be drawn from all the farms." The same case together with another case growing out of the same lease was again appealed and again decided by the same court, the report of which will be found in 184 Pa. St. 354, 39 Atl. Rep. 57, one additional point being decided as shown in point two of the syllabus. The decision as it appears in the syllabus is as follows:

"1. During the term of an oil lease of three contiguous farms, embracing six hundred acres the lessor died, having devised the farms to three different persons. The lease provided that all its conditions should extend to the parties' heirs, executors and assigns. *Held;* that each devisee was entitled to share in the royalties in the proportion that the land devised to him bears to the whole tract, though the wells were all on one farm.

"2. In such case the loss of rental value of one of the farms, caused by operation of the wells, should be deducted from the three devisees in proportion to their ownership of the surface."

If the wells drilled under the lease in case at bar had been upon the land of the testator, Henry A. Rymer, instead of the plaintiff, Frank L. Rymer, the cases would have been exactly parallel as the appellants and plaintiff are all devisees of H. A. Rymer. As that precise question does not plainly arise in this case it is not necessary to decide it here.

The case of *Natural Gas Company* v. *Ullery,* (Ohio.) 67 N. E. Rep. 494, where it is held: "Where an oil and gas lease is made by one party to another covering two or more separate tracts of land, and is made to extend to the heirs and assigns of the parties, and different persons become the owners of such different tracts, each owner is entitled to the oil and gas produced on his tract, and to the royalty and rental arising from such tract," seems to be a case quite similar to the one at bar and in harmony with the rulings of this Court, and fully sus-

tains the position hereinbefore taken    Chief Justice Burkett, in writing the opinion of the court, and referring to said Pennsylvania case, states the matter so well that we quote from his opinion as follows, page 496: "We have several times had occasion to carefully examine and consider that case, and it has always failed to receive the approval of our judgment, and upon a reconsideration here it again fails to convince us of its soundness. And the reconsideration of the same principle in the same case in *Wettengel* v. *Gormley,* 184 Pa. 354, (39 Atl. 57), fails to strengthen the original case. Those cases are between devisees, and the question as between the lessee and purchasers from the lessor was not involved, and therefore the principle of those cases is not directly applicable here. But even if it were, we do not regard it sound. Oil in the rock adheres to the real estate, and is a part thereof until brought to the surface, when it becomes personalty, just as a tree, or stone, coal, or fire clay is a part of the realty until severed, when it becomes personalty. That which is a part of the land before severance belongs to the owner of the land after severance as well as before. The fact that oil and gas are vagrant and transitory in their nature does not prevent them from adhering to and becoming part of the land while passing from one tract to another, and while so in one tract they are a part of that tract, and belong to the owner thereof until they escape from such tract, and, if brought to the surface before such escape, they become personal property belonging to the owner of the land. It therefore irresistibly follows that the oil or gas taken from a well on a particular tract of land belongs to the owner of that tract, even though the contract under which the well was drilled included other tracts of land. Because the contract of production may have included two or more tracts of land, such contract cannot have the force of taking from the owner of one tract the oil or gas adhering to such tract for the time being, and bestowing it upon the owner of another tract, where it may never have been. As oil and gas are migratory in character, no one can tell from whence they came, or whither they are going; and they must, therefore, belong to him upon whose lands they are captured. No one else can have any ownership in them, and a man can be awarded only that which he owns. *Kelley* v. *Ohio Oil Co.,* 57 Ohio St. 317, (49 N. E. 399); 39 L. R. A.

765; 63 Am. St. Rep. 721. In that case this court said, on page 328, 57 Ohio St. and page 401, 49 N. E., 39 L. R. A. 765, 63 Am. St. Rep. 721. 'Petroleum oil is a mineral, and while in the earth it is part of the realty, and, should it move from place to place by percolation or otherwise, it forms part of that tract of land in which it tarries for the time being, and if it moves to the next adjoining tract, it becomes part and parcel of that tract; and it forms part of some tract until it reaches a well and is raised to the surface, and then for the first time it becomes the subject of distinct ownership separate from the realty, and becomes personal property, the property of the person into whose well it came. And this is so whether the oil moves, percolates, or exists in pools or deposits. In either event it is property and belongs to the person who reaches it by means of a well, and severs it from the realty and converts it into personalty.' The same rule applies to all property."

There is no error in the decree and the same is affirmed.

*Affirmed.*